**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AVRAHAM SHALOM YEMINI,

                        Plaintiff,

                v.                        No. 20-cv-1386-JGK

VIACOM INC., et al.,

                        Defendants.

 

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

BALLARD SPAHR LLP
Jay Ward Brown
Leita Walker (*pro hac vice pending*)
Maxwell S. Mishkin (*pro hac vice pending*)
1675 Broadway, 19th Floor
New York, NY 10019-5820
Telephone:  (212) 223-0200
Facsimile:  (212) 223-1942
brownjay@balladspahr.com
walkerl@ballardspahr.com
mishkinm@ballardspahr.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND AND PROCEDURAL HISTORY ...................................................2

I.      The Parties ........................................................................................................2

II.     The Agreement And Interview ........................................................................4

III.    The Challenged Episode ...................................................................................6

IV.     Subsequent Events ...........................................................................................9

V.      The Complaint .................................................................................................11

ARGUMENT ...............................................................................................................12

I.      The Agreement And Yemini's Consent Bar These Claims ...........................13

II.     Yemini's Claims Also Fail Pursuant To The First Amendment And
        New York Law.................................................................................................16

        A.      No claim can arise out of pure opinions or opinions based on
                disclosed facts ....................................................................................16

        B.      No claim can arise out of constitutionally protected editorial choices ................18

        C.      No claim can arise out of alleged statements to the FBI or Facebook..................21

        D.      The IIED claim should be dismissed as duplicative ...............................................24

CONCLUSION.............................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Air Wisconsin Airlines Corp. v. Hoeper*,
571 U.S. 237 (2014)................................................................................................19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................................12

*Bihag v. A&E Television Networks, LLC*,
669 F. App'x 17 (2d Cir. 2016)........................................................................13, 14

*Biro v. Condé Nast*,
807 F.3d 541 (2d Cir. 2015)....................................................................................23

*Biro v. Condé Nast*,
883 F. Supp. 2d 441 (S.D.N.Y. 2012)....................................................12, 16, 17

*Buckley v. Littell*,
539 F.2d 882 (2d Cir. 1976)....................................................................................16

*Cummings v. City of N.Y.*,
No. 19-cv-7723(CM)(OTW), 2020 U.S. Dist. LEXIS 31572
(S.D.N.Y. Feb. 24, 2020)................................................................................16, 24

*Edelman v. Croonquist*,
No. 09-1938 (MLC), 2010 U.S. Dist. LEXIS 43399 (D.N.J. May 4, 2010)............17

*Forte v. Jones*,
No. 11-cv-0718 AWI BAM, 2013 U.S. Dist. LEXIS 39113
(E.D. Cal. Mar. 20, 2013) ......................................................................................17

*Hobbs v. Imus*,
266 A.D.2d 36 (1st Dept. 1999)..............................................................................18

*Interpharm, Inc. v. Wells Fargo Bank, N.A.*,
655 F.3d 136 (2d Cir. 2011)....................................................................................13

*Johnson v. Riverhead Central School District*,
420 F. Supp. 3d 14 (E.D.N.Y. 2018) ......................................................................22

*LeBlanc v. Skinner*,
955 N.Y.S.2d 391 (2d Dep't 2012)..........................................................................22

*LeBreton v. Weiss*,
680 N.Y.S.2d 532 (1st Dep't 1998) ........................................................................14

*Levan v. Capital Cities/ABC, Inc.*,
    190 F.3d 1230 (11th Cir. 1999) ...................................................................20

*Lucina v. Carnival PLC*,
    No. 17-CV-6849(CBA)(LB), 2019 U.S. Dist. LEXIS 49371
    (E.D.N.Y. Mar. 21, 2019) ...............................................................................4

*Masson v. New Yorker Magazine, Inc.*,
    501 U.S. 496 (1991)...........................................................................18, 19, 21

*McCafferty v. Newsweek Media Group, Ltd.*,
    955 F.3d 352 (3d Cir. 2020)...........................................................................17

*Moldea v. New York Times Co.*,
    22 F.3d 310 (D.C. Cir. 1994) ........................................................................18

*Motorola Credit Corp. v. Uzan*,
    561 F.3d 123 (2d Cir. 2009)............................................................................1

*Nath v. JP Morgan Chase Bank, N.A.*,
    732 F. App'x 82 (2d Cir. 2018) .....................................................................12

*Nevin v. Citibank, N.A.*,
    107 F. Supp. 2d 333 (S.D.N.Y. 2000)...........................................................22

*Orenstein v. Figel*,
    677 F. Supp. 2d 706 (S.D.N.Y. 2009)...........................................................23

*Paskar v. City of N.Y.*,
    3 F. Supp. 3d 129 (S.D.N.Y. 2014) ................................................................4

*Psenicska v. Twentieth Century Fox Film Corporation*,
    No. 07 Civ. 10972(LAP), 2008 U.S. Dist. LEXIS 69214
    (S.D.N.Y. Sept. 3, 2008)...............................................................................14

*Ratajack v. Brewster Fire Department, Inc.*,
    178 F. Supp. 3d 118 (S.D.N.Y. 2016)...........................................................22

*Shapiro v. NFGTV, Inc.*,
    No. 16 Civ. 9152 (PGG), 2018 U.S. Dist. LEXIS 22879
    (S.D.N.Y. Feb. 8, 2018)................................................................................13

*Squitieri v. Piedmont Airlines, Inc.*,
    No. 17CV441, 2018 U.S. Dist. LEXIS 25485 (W.D.N.C. Feb. 16, 2018) ..............17

*Standing Committee on Discipline v. Yagman*,
    55 F.3d 1430 (9th Cir. 1995) ........................................................................17

*Tonra v. Kadmon Holdings, Inc.*,
    405 F. Supp. 3d 576 (S.D.N.Y. 2019)...................................................................2, 5

*Ward v. Zelikovsky*,
    643 A.2d 972 (N.J. 1994).....................................................................................17

*Watson v. N.Y. Department of Education*,
    No. 19cv533 (JGK), 2020 U.S. Dist. LEXIS 23772 (S.D.N.Y. Feb. 11, 2020) .....................24

*Wheeler v. Twenty-First Century Fox*,
    322 F. Supp. 3d 445 (S.D.N.Y. 2018).................................................................21

## Other Authorities

2 Robert D. Sack, Sack on Defamation § 16.2.1 (5th ed. 2017).....................................................12

Restatement (Second) of Torts § 583....................................................................14, 15

Defendants Viacom International Inc. ("Viacom") and Geoff James Nugent, known professionally as Jim Jefferies ("Nugent" and, together with Viacom, "Defendants"), respectfully submit this memorandum of law in support of their motion to dismiss Plaintiff's Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Plaintiff Avraham Yemini, a self-described "internet personality," is a man at once so starved for publicity and so full of chutzpah that he agreed to be interviewed for *The Jim Jefferies Show* ("*TJJS*"), knowing full well it had complete discretion to pare down and edit the interview for its satirical purposes, only to turn around and sue when—as Yemini himself predicted would happen—the late-night television show made a mockery of his views.[1]

More specifically: Yemini signed a contract prior to his appearance in which he explicitly agreed to "release, indemnify and hold harmless" Defendants from the very types of claims he asserts here.  He then proceeded during the interview to joke that "I know what I'm about to look like from this shit" while unreservedly declaring, among other things, that Australia should ban "Islamic immigration" to keep from "end[ing] up the same shithole that they came from," and that the best way to avoid "import[ing] a violent culture" is to accept only "Non-Muslims.  That

---

[1] "The classic definition of chutzpah has been described as that quality enshrined in a man who, having killed his mother and father, throws himself on the mercy of the court because he is an orphan.  Courts in this Circuit have employed the classic definition and contemporary variations where a party's conduct is especially and brazenly faulty."  *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 128 n.5 (2d Cir. 2009) (citation and internal marks omitted).

simple."  Now, Yemini has the gall to allege that Defendants may be held liable under the law of defamation for purportedly depicting him in the episode as "anti-immigrant" and "anti-Muslim."

It is, however, settled law in this Circuit that Yemini's claims are barred not only by the written release that Yemini signed before his interview, but also by his consent—demonstrated on the face of the recorded interview itself—to be interviewed and to have his interview used in unflattering ways.  Moreover, even if he had not knowingly and voluntarily given up any right to bring this lawsuit, Yemini still would be unable to state a claim because the First Amendment and New York law protect the speech at issue here.

For these and the additional reasons discussed below, Defendants respectfully submit that once the Court reviews the agreement Yemini signed, the challenged episode, and the full recording of the interview, it will be apparent that this Complaint should be dismissed with prejudice.[2]

## BACKGROUND AND PROCEDURAL HISTORY

### I.    The Parties

A self-described "writer, producer, author, political commentator, and internet personality" based in Australia, Yemini regularly engages in public discussion and debate on the

---

[2] The Court may consider these materials because they are "referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken."  *Tonra v. Kadmon Holdings, Inc.*, 405 F. Supp. 3d 576, 580 (S.D.N.Y. 2019).

most contentious issues of the day.  Compl. ¶ 3, Feb. 18, 2020 (Dkt. No. 3).[3]  Yemini primarily

shares his commentaries and criticisms with the world on YouTube, where he has "more than

390,000" subscribers, and on Twitter, where he has "approximately 71,000 followers."  *Id.*

Yemini also "writes for *TR News*," *id.*, which calls itself "a truly independent news site that

reports the unreported news to the forgotten people of Britain that the mainstream media refuse

to publish."[4]  He also "has written for *The Times of Israel*, regularly appears on Australian and

American television stations including *Sky News* and *TR News*, and has spoken as a guest on *The

Project*, *Sunrise*, and *The Today Show*, among others."  Compl. ¶ 3.

Among other topics, Yemini has often voiced his views on Australia's immigration

policy, writing that "[i]mmigration without integration, is invasion," and that Australia must

"stop importing the wrong Africans."[5]  He also has offered his perspective on matters of faith,

writing that "ISLAM is immoral" and that "Islam is the manifesto that instructs Muslims to carry

out their Jihadi attacks."[6]  In 2018, Yemini ran for the Parliament of Victoria as a member of the

---

[3] As required, Defendants accept well-pleaded factual allegations set forth in the Complaint

as true for purposes of this motion only.

[4] *See Support Us*, TR News, https://www.tr.news/support-us/.

[5] *See* Avi Yemini (@OzraeliAvi), Apr. 18, 2018,

https://twitter.com/OzraeliAvi/status/986810995007000576; Avi Yemini (@OzraeliAvi),

Mar. 14, 2018, https://twitter.com/OzraeliAvi/status/973821978401558533.

[6] *See* Avi Yemini (@OzraeliAvi), Feb. 13, 2018,

https://twitter.com/OzraeliAvi/status/963630740842975234; Avi Yemini (@OzraeliAvi),

Mar. 15, 2019, https://twitter.com/OzraeliAvi/status/1106419589062103040.

"Australian Liberty Alliance," which the U.S. State Department has characterized as an "anti-Islam" political party.[7]

Defendant Nugent, a comedian and an American citizen originally from Australia, was "the creator, executive producer, and star" of *TJJS*.  Compl. ¶ 6.  Defendant Viacom indirectly owns the cable television channel Comedy Central, which formerly distributed *TJJS*.  *Id.* ¶ 5. Putative defendant "Viacom Inc." no longer exists following its December 2019 merger with and into CBS Corporation, now known as ViacomCBS Inc.[8]

## II.    The Agreement And Interview

Yemini agreed to be interviewed for *TJJS* in January 2019.  Compl. ¶ 10.  Though Yemini now asserts that his participation was subject to two conditions relating to how the interview ultimately would be used in a future program, the terms of the agreement were reduced to a written contract that Yemini executed on January 22, 2019.  A true and correct copy of that

---

[7] *See State Election 2018: Southern Metropolitan Region*, Victorian Electoral Comm'n, https://www.vec.vic.gov.au/Results/State2018/SouthernMetropolitanRegion.html; U.S. Dep't of State, Bureau of Democracy, Human Rights, and Labor, *2015 Report on Int'l Religious Freedom: Austl.* (Aug. 10, 2016), https://2009-2017.state.gov/j/drl/rls/irf/2015/eap/256089.htm. "Official government reports and other types of government records are appropriate for judicial notice," *Paskar v. City of N.Y.*, 3 F. Supp. 3d 129, 134 (S.D.N.Y. 2014), including "official foreign government-promulgated documents," *Lucina v. Carnival PLC*, No. 17-CV-6849(CBA)(LB), 2019 U.S. Dist. LEXIS 49371, at *18 n.4 (E.D.N.Y. Mar. 21, 2019).

[8] *See, e.g.*, Form 8-K, ViacomCBS Inc. (Dec. 3, 2019), https://ir.viacbs.com/static-files/5f9f66c0-0714-4f68-a036-2faedce86dd8.

contract (the "Agreement") is attached as Exhibit A to the accompanying declaration of Jay Ward Brown ("Brown Decl.").[9]  There, Yemini agreed, *inter alia*, to "release, indemnify and hold harmless [Defendants] . . . from any and all claims . . . arising from . . . the use of ideas or words expressed by [Plaintiff] in [*TJJS*] or acts done by [Plaintiff] in connection therewith." Brown Decl., Ex. A.  The Agreement further provides that it is governed by New York law, and it includes a merger clause stating that the Agreement "is the complete and binding agreement between [Defendants] and [Yemini], and it supersedes all prior understandings and/or communications, both oral and written, with respect to its subject matter."  *Id.*

Yemini was interviewed in Singapore "[o]n or about January 24, 2019."  Compl. ¶ 11. As agreed, Defendants recorded the interview for possible use in a future episode of *TJJS*. Unbeknownst to Defendants at the time, Yemini also recorded the interview, on his cell phone, *id.* ¶ 32, and shortly after the interview concluded, Yemini posted on Twitter that he had "[j]ust spent an hour schooling [Nugent] on immigration" and that his followers need not "worry" because he "secretly filmed it all in case they try their pesky editing tricks on me."[10]

In other words, Yemini participated in the interview fully aware of the nature of *TJJS* specifically and the satirical, late-night television genre more generally.  In fact, at multiple points during the interview he acknowledged both the show's particular point of view and the

---

[9] The Court can review the Agreement at the motion to dismiss stage because Yemini references it (albeit inaccurately) in his Complaint.  Compl. ¶¶ 10-11; *Tonra*, 405 F. Supp. 3d at 580.

[10] *See* Avi Yemeni (@OzrealiAvi), Jan. 23, 2019, https://twitter.com/OzraeliAvi/status/1087988271249010689.

likelihood that the interview would be edited for comedic effect or to make a point at Yemini's own expense. For example, after Nugent remarked that he would edit out one of his own jokes that fell flat, because he "never look[s] bad in these interviews," Compl. ¶ 34, Yemini responded: "I know what I'm about to look like from this shit," Brown Decl., Ex. E at 91:21-25. Likewise, Yemini remarked at one point that he expected his statements would be edited because the interview had already produced "a couple little clips there where it makes me sound like a total fucking racist," leading Nugent to assure Yemini that "no one ever comes out good on these interviews," to which Yemini agreed, "No one does." *Id.* at 76:18-77:8.

### III.    The Challenged Episode

On March 15, 2019, an Australian terrorist who "expressed anti-immigrant, anti-Muslim sentiments and white supremacist rhetoric" "shot and killed 51 Muslims and injured another 49 in two different mosques in Christchurch, New Zealand." Compl. ¶¶ 12-13. Four days later, on March 19, 2019, *TJJS* televised an episode titled *The Rise of White Nationalism* (the "Episode") that mentioned the Christchurch shootings. *Id.* ¶ 14. A true and correct copy of the Episode, which included portions of the Yemini interview, is attached as Exhibit B to the Brown Declaration, and a court reporter's transcript of the Episode is attached as Exhibit C. Though the Episode speaks for itself, and the Court need not accept either party's characterization of it, Defendants submit that the following is a fair summary:

The Episode begins with Nugent welcoming the audience after a hiatus and referencing the recent shootings in Christchurch. Ex. C at 2:18-3:25. He then states that, "[w]hile a tragedy like this is rare in New Zealand, here in the United States white supremacists are responsible for the majority of terrorist attacks." *Id.* at 4:8-11. After noting that white supremacist views are often spread on the Internet, both through niche websites such as 4chan and by way of YouTube

6

and other major platforms, *id.* at 4:15-19, he then connects the online availability of extremist content to the Christchurch shooting, observing that the perpetrator "tweeted about the attack, quoted Internet memes and live-streamed the shooting on Facebook," after which video of the shooting "was reposted more than a million times, and Facebook, YouTube and Twitter are still struggling to control it." *Id.* at 7:10-20.

Following a commercial break, Nugent continues discussing the Christchurch attack, noting that the shooter "left behind a detailed record of his anti-immigrant, anti-Muslim rhetoric," and observing that "these days this kind of intolerance is being tolerated in more places than you might think," such that "[y]ou have to try really, really hard to not see the rising tide of white nationalism, anti-immigrant and anti-Muslim sentiment around the globe." *Id.* at 8:23-9:8. He then notes that "this anti-immigrant fervor is uniting some strange groups," including certain Jews and the "alt-right" who have a "shared hatred of Muslims." *Id.* at 10:11-15.

At this point, Yemini is introduced. *Id.* at 10:15-16. Yemini is first shown expressing his view that Australia should "cut" all "Islamic immigration." *Id.* at 10:17-18. When asked about allowing immigrants from South Africa, Yemini replies, "I think we should allow the white South African farmers in." *Id.* at 10:24-11:2. Yemini then states, "[W]e're not gonna import a violent culture," and when pressed on how to identify which immigrants satisfy that standard, Yemini responds, "Non-Muslims." *Id.* at 11:6-12. He then explains that, in his view, the question "[A]re you violent?" can simply be posed as "Are you Muslim?" *Id.* at 11:6-16.

Nugent then asks rhetorically, "[W]hat makes [Yemini] suddenly feel so comfortable saying this shit out loud," and offers a possible answer: "[J]ust like in America, more and more Australian officials are comfortable saying this shit out loud." *Id*. at 11:21-25. He compares Australian politicians' "ginning up fear of immigrants" with President Trump's rhetoric, and

then returns to the Yemini interview, quoting Yemini's own echoes of President Trump in stating that "[w]alls work." *Id.* at 12:11-19.

Continuing on that topic—and in a portion of the Episode demonstrating how *TJJS* uses editing techniques to bring silliness and satire to discussion of serious issues—Nugent explains in voiceover that he "just found out that Australia is home to the largest migration fence in the world." *Id.* at 13:9-11. After showing several tongue-in-cheek questions posed to an Australian man who maintains a section of the fence, it is eventually revealed to viewers that the fence is meant to keep out dingoes, not humans. *Id.* at 14:5-15:1. An "animal expert" explains that "the fence was built to protect the cattle and sheep," leading Nugent to describe the livestock (again, tongue firmly in cheek) as "[i]nnocent white victims" whose "communities [are] invaded by violent killers." *Id.* at 15:1-25. Further lampooning anti-immigration talking points, he remarks that, when dingoes get past the fence, "[s]ome refuse to assimilate, living by their own set of laws. Others get lazy living off the fat of the land." *Id.* at 16:5-20.

Nugent then returns again to the Yemini interview, asking, "[W]hat gives anyone the right to tell anyone where they can and cannot live?" *Id.* at 17:6-8. This is followed by an excerpt from the interview in which Yemini states, "When you import this culture, what do you think's gonna happen? Australia's gonna end up the same shithole that they came from that they were escaping." *Id.* at 17:9-12. After another clip in which Yemini accuses Nugent of "believ[ing] in fairy tales," Nugent addresses his audience: "I'll tell you a fairy tale. If you think all this overheated rhetoric about immigrants doesn't have real consequences, then you're ignoring reality. . . . 50 people were killed in New Zealand because a deranged asshole became convinced that Muslim lives are worth less. Words matter." *Id.* at 19:1-10.

The relevant segment of the Episode concludes with Yemini being asked whether he believes that Australia's dingo fence is working.  *Id.* at 19:14-25.  When Yemini answers, "I don't live in the Outback," Nugent responds, "You should.  There's lots of white people there.  You'd love it," before laughing and adding, "They'd hate you."  *Id.* at 20:1-6.  The Episode then proceeds to address a series of topics unrelated to this case and concludes.  *Id.* at 21:7-29:1.

**IV.    Subsequent Events**

The day after the Episode aired, Yemini published a video on YouTube titled *Hidden Camera: Jim Jefferies Exposed* ("*Hidden Camera*").  Compl. ¶ 32 & n.4.[11]  Yemini explained that he "knew what the[] plan was all along" for his appearance on *TJJS*, describing the interview as "a set-up."  Yemini had therefore "secretly put [his] phones down to record" the interview so that he could reveal any "rubbish edits" to his 390,000 YouTube subscribers.  *Id.* ¶ 3.  For the Court's convenience, a true and correct copy of the complete interview is attached as Exhibit D to the Brown Declaration, and a court reporter's transcript of the recording is attached as Exhibit E.

According to Yemini, his publication of the "unedited interview footage shocked the public."  Compl. ¶ 35.  Yemini asserts that "[m]edia outlets from all over the world began

---

[11] Yemini's video is available online at https://www.youtube.com/watch?v=odCQhAezB_Q. Because the Agreement provides that Defendants are "the exclusive owner of all copyright and other rights in and to [*TJJS*], [Yemini's] Likeness, and any excerpts therefrom, and that [Defendants] will have the exclusive right to use" the same "in any and all media," *see* Brown Decl., Ex. A, Yemini also violated the terms of the Agreement by posting this video online.

covering the story," after which Yemini "agreed [to] participate in interviews with American journalists and booked a flight from Australia to the United States."  *Id*. ¶ 36.

Yemini then alleges on "information and belief" that, after planning his trip to the United States, Defendants "report[ed] [him] as a terrorist" to Facebook, and "Facebook subsequently deleted [his] account without [his] consent or authorization."  *Id.* ¶ 37.  Likewise on "information and belief," Yemini alleges that Defendants "reported [him] as a terrorist" to the FBI, and that as a result when Yemini landed in Los Angeles, he was detained and interrogated. *Id.* ¶¶ 38-39.

As Yemini fully described the experience on *TR News*, "CBP maintained they had reviewed both [his] and [his traveling companion's] writings online prior to their arrival.  During the interrogation the FBI referred to several of Yemini's social media posts, supplied to them courtesy of Comedy Central.  These posts included an image that U.K.-based media company Politicalite used in an article about Yemini and [his companion]'s tour depicting Yemini as an Israeli Defence Force (IDF) soldier holding a firearm.  The FBI questioned Yemini about his IDF training and asked if he intended to acquire firearms or weapons in the U.S. for his interaction with [Nugent]."[12]  Yemini published a copy of the image in question on *TR News*, depicting himself holding a rifle next to a photograph of Nugent:

---

[12] *See* Avi Yemini, *Sydney Watson Speaks Out About Being Detained by the FBI*, TR News (Apr. 15, 2019), https://www.tr.news/sydney-watson-speaks-out-about-being-detained-by-the-fbi/.



Yemini was denied entry to the United States and sent back to Australia.  Compl. ¶¶ 38-39.

## V.     The Complaint

Plaintiff filed this lawsuit on February 19, 2020.  Based on the above allegations, Yemini asserts claims for defamation (Count I), defamation per se (Count II), and intentional infliction of emotional distress (Count III).  *Id.* ¶¶ 40-61.  Yemini seeks in excess of $25 million in compensatory and punitive damages, as well as an order requiring Defendants to remove the Episode "from all public domains."  *Id.* at 16.

Pursuant to the Court's Individual Practices, on April 30, 2020, Defendants requested a pre-motion conference regarding an anticipated motion to dismiss Yemini's Complaint pursuant to Rule 12(b)(6).  Dkt. No. 12.  On May 5, 2020, the Court ruled that a pre-motion conference was unnecessary and permitted Defendants to file a motion to dismiss by June 2, 2020.  Dkt. No. 13.  Defendants now timely file this motion to dismiss.

## **ARGUMENT**

To avoid dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint that pleads facts "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citation and internal marks omitted).  Though courts "must accept as true all the factual allegations in the complaint, that requirement is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice, and pleadings that are no more than conclusions[] are not entitled to the assumption of truth."  *Nath v. JP Morgan Chase Bank, N.A.*, 732 F. App'x 82, 83 (2d Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678-79) (internal marks omitted).

Because claims arising from challenged speech implicate constitutional rights even from the outset of litigation, courts review them with care.  Indeed, "there is 'particular value' in resolving defamation claims at the pleading stage, 'so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms.'"  *Biro v. Condé Nast*, 883 F. Supp. 2d 441, 457 (S.D.N.Y. 2012) (citation omitted), *aff'd*, 807 F.3d 541 (2d Cir. 2015).  Claims arising from publications are susceptible to early judicial action for a more practical reason as well:  "[U]nlike in most litigation, in a libel suit the central event—the communication about which suit has been brought—is ordinarily before the judge at the pleading stage.  He or she may assess it upon a motion to dismiss, firsthand and in context."  2 Robert D. Sack, Sack on Defamation § 16.2.1 (5th ed. 2017).

Here, Yemini fails to plead any facts that would establish a plausible claim for defamation or intentional infliction of emotional distress ("IIED").  The Agreement that Yemini

signed prior to the interview bars these claims as a threshold matter, as does the consent he gave by participating in it—consent he cannot deny he gave with open eyes.  Moreover, the speech at issue is protected from liability by the First Amendment and New York law.  Plaintiff's Complaint should be dismissed with prejudice.

## I.       The Agreement And Yemini's Consent Bar These Claims

Yemini completely foreclosed the claims he asserts in this lawsuit when he signed the Agreement prior to participating in the *TJJS* interview.  Under New York law, which controls this dispute under the terms of the Agreement, "a valid release constitutes a complete bar to an action on a claim which is the subject of the release."  *Interpharm, Inc. v. Wells Fargo Bank, N.A.*, 655 F.3d 136, 142 (2d Cir. 2011) (citation and internal marks omitted).  For that reason, "[a] release is a jural act of high significance without which the settlement of disputes would be rendered all but impossible, and should not be treated lightly or casually set aside."  *Shapiro v. NFGTV, Inc.*, No. 16 Civ. 9152 (PGG), 2018 U.S. Dist. LEXIS 22879, at *15 (S.D.N.Y. Feb. 8, 2018) (citations, alterations, and internal marks omitted) (granting motion to dismiss based on signed release).

Here, Yemini agreed to "release, indemnify, and hold harmless" Defendants "from any and all claims, demands, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and court costs) arising from . . . the use of ideas or words expressed by [Yemini] in [*TJJS*] or acts done by [Yemini] in connection therewith."  Brown Decl., Ex. A.  Because Yemini's claims all "aris[e] from" how his "ideas or words" were used in the Episode, the plain language of the Agreement bars those claims as a matter of law.

The Second Circuit has made it clear that dismissal with prejudice is the correct result in these circumstances.  In *Bihag v. A&E Television Networks, LLC*, for example, the Second

13

Circuit affirmed judgment against a plaintiff who sued over his depiction in the *Dog the Bounty Hunter* reality television program, because he had voluntarily released the defendants from "'any and all claims' arising out of [his] 'appearance or participation in the program.'"  669 F. App'x 17, 18 (2d Cir. 2016).  Likewise, in *Psenicska v. Twentieth Century Fox Film Corporation*, plaintiffs sued over their depictions in the 2006 mockumentary film *Borat*, but the district court dismissed the complaint on the ground that each of the plaintiffs "had executed a valid agreement releasing the claims [they] now attempt[] to litigate," No. 07 Civ. 10972(LAP), 2008 U.S. Dist. LEXIS 69214, at *3 (S.D.N.Y. Sept. 3, 2008), and the Second Circuit affirmed, holding that "[h]owever plaintiffs cast their claims, dismissal was compelled" under the terms of the release, 409 F. App'x 368, 372 (2d Cir. 2009).

Yemini has no basis on which he could avoid the Agreement.  The *Psenicska* plaintiffs, for instance, alleged they had been misled about the nature of the *Borat* film before agreeing to participate, yet the Southern District and the Second Circuit both concluded that the releases they signed barred their suits despite such alleged misrepresentations.  Here, Yemini boasts that he "knew what the[] plan was all along" as to how his interview would be edited and incorporated into a future *TJJS* broadcast.  *See Hidden Camera*, *supra* n.11 at 1:45-2:00.  The Court should therefore dismiss Yemini's Complaint pursuant to the unambiguous language of the Release that he knowingly and voluntarily signed.

Furthermore, even if Yemini had not signed the Release expressly prohibiting him from bringing these claims, which he did, his own consent to the appearance separately bars his claims.  Section 583 of the Restatement (Second) of Torts provides that "the consent of [plaintiff] to the publication of defamatory matter concerning him is a complete defense to his action for defamation."  *See, e.g.*, *LeBreton v. Weiss*, 680 N.Y.S.2d 532, 532 (1st Dep't 1998)

(citing Section 583 and affirming dismissal of libel claim where "plaintiff consented to the publication of the alleged defamatory statements").  Under this doctrine of consent-to-libel, "[i]t is not necessary that [plaintiff] *know* that the matter to the publication of which he consents is defamatory in character.  It is enough that . . . he has reason to know that it *may* be defamatory. In such a case, by consent to its publication, he takes the risk that it may be defamatory." Section 583 cmt. d (emphases added).

Yemini manifested such consent both during and after the interview.  During the interview, Yemini made a number of statements indicating that he understood that *TJJS* was a satirical show with a particular perspective and that his interview might be edited in an unflattering way—remarking, for example, that "I know what I'm about to look like from this shit," that he might come across as a "a total fucking racist," and agreeing that "no one ever comes out good on these interviews."  Brown Decl., Ex E at 76:18-77:8, 91:21-25.  Immediately following the interview, moreover, Yemini posted on Twitter that he had surreptitiously made his own recording precisely because he anticipated that Defendants might engage in what he called "pesky editing tricks."[13]  And after the challenged Episode aired, Yemini stated in his YouTube video that he "knew what the[] plan was all along" as to how the interview would be edited.  *See Hidden Camera*, *supra* n.11 at 1:45-2:00.  Given these statements, Yemini cannot contend that he had no reason to know that *TJJS* might depict him in an unfavorable light.

---

[13] Avi Yemeni (@OzrealiAvi), Jan. 23, 2019,

https://twitter.com/OzraeliAvi/status/1087988271249010689.

In sum, Yemini's claims cannot survive this motion to dismiss because of the Agreement he signed prior to the interview and, separately, because of the consent he gave by participating in that interview.

## II.   Yemini's Claims Also Fail Pursuant To The First Amendment And New York Law

Even if Yemini's defamation and IIED claims were not barred by the doctrines of release or consent, those claims would nevertheless fail as a matter of constitutional and state law on multiple grounds.

### A.   No claim can arise out of pure opinions or opinions based on disclosed facts.

The gravamen of Yemini's Complaint is that the Episode "portray[ed] him as an anti-immigrant, anti-Muslim, white supremacist, racist, nationalist." Compl. ¶ 31. Even if *TJJS* had *expressly* labelled Yemini in that manner, however, those labels are nonactionable expressions of pure opinion, and "[u]nder both New York and federal law, statements of pure opinion are not actionable as defamation." *Biro*, 883 F. Supp. 2d at 459 (citations omitted). "This is because a statement of opinion is not an assertion of fact that can be proved false, and an assertion that cannot be proved false cannot be held libelous. Thus, an expression of pure opinion is protected however unreasonable the opinion or vituperous the expressing of it may be." *Id.* at 459-60 (citations, alterations, and internal marks omitted).

New York courts have "consistently held that terms like 'racist' constitute nonactionable opinion." *Cummings v. City of N.Y.*, No. 19-cv-7723(CM)(OTW), 2020 U.S. Dist. LEXIS 31572, at *54-56 (S.D.N.Y. Feb. 24, 2020) (collecting cases); *see also Buckley v. Littell*, 539 F.2d 882, 893-95 (2d Cir. 1976) (words "fascist" and "radical right" are "loose" and "ambigu[ous]" and cannot be regarded as statements of fact because of "tremendous imprecision" of meaning and usage). The same is true across states and circuits. *E.g.,*

16

*McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 358 (3d Cir. 2020) ("In Pennsylvania, 'a simple accusation of racism' is not enough" to give rise to defamation claim.); *Standing Comm. on Discipline v. Yagman*, 55 F.3d 1430, 1440 (9th Cir. 1995) (calling judge "anti-Semitic" was a non-actionable opinion); *Squitieri v. Piedmont Airlines, Inc.*, No. 17CV441, 2018 U.S. Dist. LEXIS 25485, at *12-13 (W.D.N.C. Feb. 16, 2018) ("Statements indicating that Plaintiff is racist are clearly expressions of opinion that cannot be proven as verifiably true or false.") (collecting cases); *Forte v. Jones*, No. 11-cv-0718 AWI BAM, 2013 U.S. Dist. LEXIS 39113, at *15 (E.D. Cal. Mar. 20, 2013) ("[T]he allegation that a person is a 'racist' . . . is not actionable because the term 'racist' has no factually-verifiable meaning."); *Edelman v. Croonquist*, No. 09-1938 (MLC), 2010 U.S. Dist. LEXIS 43399, at *17-18 (D.N.J. May 4, 2010) ("characterization of [plaintiffs] as racists is a subjective assertion, not sufficiently susceptible to being proved true or false to constitute defamation"); *Ward v. Zelikovsky*, 643 A.2d 972, 983 (N.J. 1994) (accusation that plaintiffs "hate Jews" nonactionable opinion).

Regardless of whether Yemini means to allege that Defendants expressly accused him of being a bigot or did so implicitly, therefore, such an accusation is not actionable as a matter of law.[14]  The First Amendment fully permits Defendants to televise Yemini's views—including that Australia should cease all Muslim immigration for fear of importing a "violent culture" and

---

[14] *See Biro*, 883 F. Supp. 2d at 468 ("If the Constitution protects an author's right to draw an explicit conclusion from fully disclosed facts, then an unstated inference that may arise in a reader's mind after reading such facts is also protected as an implicit expression of the author's opinion.").

turning Australia into a "shithole" country—even if the *TJJS* audience concludes from that

telecast that Yemini is anti-immigrant or anti-Muslim or otherwise bigoted.

### B.   No claim can arise out of constitutionally protected editorial choices.

In addition to asserting that the Episode generally portrays him as prejudiced or

intolerant, Yemini also claims that the Episode defamed him by editing certain statements he

made in the interview, "creat[ing] an elaborate, alluring lie."  Compl. ¶ 14.  In particular, Yemini

alleges that Defendants "spliced the video and changed the sequence of the conversation" at four

separate points to "bolster" a "false impression" about him.  *Id.* ¶¶ 24-29.  Importantly, however,

he does not deny saying the things the Episode shows him saying, nor does he explain how

quoting these statements—even if out of order—somehow gave a "false impression."

Editing for humor, interposing sarcastic commentary, offering tongue-in-cheek

juxtapositions, and the like—all meant to entertain viewers—are the stock-in-trade of shows

such as *TJJS.*  Viewers know it—Yemini himself knew it—and they "take [the] railings" of such

programs "with a grain of salt."  *See, e.g.*, *Moldea v. New York Times Co.*, 22 F.3d 310, 313

(D.C. Cir. 1994); *see also Hobbs v. Imus*, 266 A.D.2d 36, 37 (1st Dept. 1999) (discussing "crude

and hyperbolic" nature of shock jock radio programs).  The editing Yemini complains of here

hardly sets *TJJS* apart from other shows in its genre, and it is difficult to believe that any viewer

believed the exchanges included in the Episode were presented verbatim from the interview.

In any event, the Supreme Court has provided clear instructions for how a court is to

analyze a libel claim where, as here, the plaintiff alleges he has been defamed by the editing of

his own statements.  In *Masson v. New Yorker Magazine, Inc.*, the Court held that such editing is

*not* actionable unless the process causes a *material* change in the meaning of the plaintiff's

statements—that is, an edit which produces no "material" change in meaning is protected by the

First Amendment as substantially true speech.  501 U.S. 496, 515-17 (1991).  The Court imposed

this "material change in meaning" requirement because it recognized that, as a practical matter,

content creators *must* excerpt the words spoken or written by interviewees, and other source

material, for reasons of space, clarity, and context.  *See id.* at 515 ("Even if a journalist has tape-

recorded the spoken statement of a public figure, the full and exact statement will be reported in

only rare circumstances" because of the "practical necessity to edit.").  Thus, a libel claim arising

out of edits to a plaintiff's own statements can survive dismissal only where the edited quotations

"would have a different effect on the mind" of the viewer than what the plaintiff said in full.  *Id.*

at 517; *Air Wis. Airlines Corp. v. Hoeper*, 571 U.S. 237 (2014) (reaffirming *Masson*).

As the Court can see for itself by comparing the Episode to the complete interview, the

four edits to Yemini's responses that he challenges here did not create *any* change in meaning,

let alone a *material* change required to give rise to an actionable claim.

First, Yemini challenges how Defendants allegedly edited his response to a question

"about whether Australia should allow black South Africans to immigrate into the country."

Compl. ¶ 25.  In both the Episode and the complete interview, however, Nugent cuts off

Yemini's non-responsive answer by saying, "I'll take that as a no," such that there is no change

in meaning whatsoever as a result of the edit.  *Id.*

Second, Yemini challenges how Defendants allegedly edited his response to a question

"about immigration and whether people should have a right to choose where they live."  *Id.* ¶ 26.

In the Episode, Yemini is shown stating that, without restrictions on immigration, "Australia is

going to end up the same shithole that they came from."  *Id.*  In the interview itself, Yemini

responded that a lack of immigration restrictions "goes against human nature.  It just doesn't

work."  Brown Decl., Ex. E at 38:17-39:18.  His "shithole" remark came earlier in the interview,

in response to a question about allowing Syrian refugees into Australia.  At that juncture, Yemini expressed some sympathy for refugees but went on to explain that letting them into the country on a "mass scale" would turn Australia into the "same shithole" that Syria is and that France, in Yemini's opinion, also has become.  *Id.* 11:4-12:16.  The edit therefore creates no material change in meaning: Yemini said and apparently believes that certain immigrants come from undesirable countries and that they will make Australia undesirable.  The wording of the question that prompted him to twice make this statement during the interview does not matter. *See, e.g.*, *Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230, 1241 n.34 (11th Cir. 1999) (no material change in meaning where broadcaster edited video to show plaintiff's answer to different question than depicted).

Third, Yemini challenges how Defendants allegedly edited his response to a question "about whether [he] believes 'whites' ever do anything wrong."  Compl. ¶ 27.  In the Episode, Yemini is shown reacting with silent "astonish[ment]," while in the original interview Yemini responded, "There are plenty of bad whites, what's your point?"  *Id.*  Once again, Yemini does not articulate how this edit could possibly create a different impression of Yemini in the mind of a reasonable viewer:  In either case, Yemini would be shown displaying incredulousness at the question, whether silently or by retorting with his own question.

Fourth, Yemini challenges how Defendants allegedly edited his response to a question "regarding his views on homegrown and Islamic terrorism."  *Id.* ¶ 28.  The question follows the observation that "statistically, in America, there's way more homegrown terrorists than there are Islamic terrorists," and Yemini is shown stating, "I think you're nuts."  In the original interview, meanwhile, Yemini quibbles with the definition of "terrorism" and then baldly asserts that "terrorism today, the majority of it is Islamic around the world."  *Id.*  In both cases, therefore, the

meaning of Yemini's response is unchanged: he expresses disbelief at the suggestion that "Islamic terrorists" may not be as significant a threat as commonly portrayed.

None of these edits comes close to the type of "material change in meaning" that the Supreme Court has held can be actionable.  Indeed, in *Masson*, the Court concluded that even where defendant attributed to plaintiff words *he concededly did not say*, that editorial choice was not actionable because it still "convey[ed] the gist" of what plaintiff actually said.  501 U.S. at 524; *see also Wheeler v. Twenty-First Century Fox*, 322 F. Supp. 3d 445, 454 (S.D.N.Y. 2018) (citing *Masson* and dismissing defamation claim based in part on conclusion that, "quotes in the [challenged] Article attributed to Plaintiff are not false because Plaintiff has failed to show that they had a different effect on the mind of the reader from that which the truth would have produced") (alteration and internal marks omitted).

Unlike the defendants in *Masson*, Defendants here did not put words in Yemini's mouth. Rather, they simply excerpted his lengthy interview—as all editors and producers must—for use in a 7-minute segment of a comedy program that Yemini fully understood would be crafted for satirical effect.  Because Yemini has failed to demonstrate that *any* of the edits to his interview created a *material* change in the meaning of his statements, those routine editorial choices are constitutionally protected and no claim can arise out of them as a matter of law.

C.      **No claim can arise out of alleged statements to the FBI or Facebook.**

Finally, Yemini alleges "[u]pon information and belief" that Defendants defamed him by "reporting [him] as a terrorist" to the FBI and to Facebook after they "learn[ed] that [he] was flying to the United States."  Compl. ¶¶ 37-39.  The Complaint offers no details whatsoever about these putative statements, and Yemini does not specify with what *scienter* Defendants

purportedly made them, pleading that Defendants acted "intentionally, knowingly, recklessly, or negligently." *Id.* ¶ 39.  These shotgun allegations fail to state a viable claim for multiple reasons.

First, even if Defendants communicated that Yemini is a "terrorist" to both the FBI and Facebook, such a communication is not actionable because of the constitutional protections for expressions of opinion discussed above.  Indeed, New York courts have repeatedly rejected defamation claims arising out of alleged descriptions of the plaintiff as dangerous or violent on this basis.  *See, e.g.*, *Ratajack v. Brewster Fire Dep't, Inc.*, 178 F. Supp. 3d 118, 165 (S.D.N.Y. 2016) (defendant's "articulated concerns that Plaintiff was a racist or a future threat to others" are expressions of "nonactionable opinion"); *Johnson v. Riverhead Cent. Sch. Dist.*, 420 F. Supp. 3d 14, 31-33 (E.D.N.Y. 2018) (statements calling plaintiff "a threat" to his school and "compar[ing] Plaintiff to the Columbine and Newtown school shooters" are "non-actionable opinion statements"); *LeBlanc v. Skinner*, 955 N.Y.S.2d 391, 400 (2d Dep't 2012) (affirming trial court's ruling that an "accusation . . . that the plaintiff was a 'terrorist' was not actionable").  Here, by Yemini's own account, the FBI saw fit to question him "about his [military] training and asked if he intended to acquire firearms or weapons in the U.S. for his interaction with [Nugent]."[15]

Second, even if Defendants communicated to the FBI that Yemini is a "terrorist," that communication would be privileged from liability under New York law.  *See, e.g.*, *Nevin v. Citibank, N.A.*, 107 F. Supp. 2d 333, 344 (S.D.N.Y. 2000) ("Statements made by individuals to

---

[15] *See* Avi Yemini, *Sydney Watson Speaks Out About Being Detained by the FBI*, TR News (Apr. 15, 2019), https://www.tr.news/sydney-watson-speaks-out-about-being-detained-by-the-fbi/.

law enforcement officers are generally accorded the qualified privilege.").  To defeat such a

qualified privilege, Yemini would have to "demonstrate that the [speaker] made the statement

with malice," which "in this context has been interpreted to mean spite or a knowing or reckless

disregard of a statement's falsity."  *Orenstein v. Figel*, 677 F. Supp. 2d 706, 711 (S.D.N.Y.

2009).  The Second Circuit has explained, however, that because "Rule 8's plausibility standard

applies to pleading intent," in libel claims "malice must be alleged plausibly."  *Biro*, 807 F.3d at

545.  Baldly alleging that a defendant "acted 'knowingly,' 'recklessly,' and 'maliciously,'" as

Yemini does here, fails to satisfy that plausibly requirement, as a plaintiff must "do more than

recite the elements of a cause of action in conclusory statements."  *Orenstein*, 677 F. Supp. 2d at

711 (citing *Twombly*, 550 U.S. at 570).

      <u>Third</u>, even if Defendants communicated that Yemini is a "terrorist" to Facebook, his

Complaint does not set out a plausible defamation claim arising from that statement.  Yemini has

asserted that Defendants contacted Facebook "in response to learning that [he] was flying to the

United States" following the Episode.  Compl. ¶ 37.  Yemini, however, announced his plans to

"confront" Nugent on March 27, 2019—two days *after* Facebook deleted his account, according

to Yemini. *Compare* Avi Yemini (@OzraeliAvi)

[https://twitter.com/ozraeliavi/status/1110786527804588032](https://twitter.com/ozraeliavi/status/1110786527804588032) (March 27, 2019 post stating that

Yemini is "going to America to CONFRONT @jimjefferies and @ComedyCentral), *with* Avi

Yemini (@OzraeliAvi), [https://twitter.com/OzraeliAvi/status/1110328269931319296](https://twitter.com/OzraeliAvi/status/1110328269931319296) (March 25,

2019 post displaying screenshot of Yemini's Facebook page with notification that it "has been unpublished for using hate speech, which goes against the Facebook Community Standards").[16]

As with his claims arising out of the Episode, Yemini's claims arising out of alleged communications about him between Defendants and the FBI or Facebook fail as a matter of law.

### D.    The IIED claim should be dismissed as duplicative.

"Under New York law, a tort claim based on the same conduct underlying a defamation claim fails as a matter of law, because New York cases have held that a separate cause of action for what are essentially defamation claims should not be entertained." *Cummings*, 2020 U.S. Dist. LEXIS 31572 at *77-78 (alterations and internal marks omitted) (citing *Anyanwu v. CBS, Inc.*, 887 F. Supp. 690, 693 (S.D.N.Y. 1995)).  "On this basis, courts applying New York law" routinely dismiss IIED claims "paired with defamation claims." *Id.* (citing *Matthaus v. Hadjedj*, 49 N.Y.S.3d 393 (1st Dep't 2017)); *Watson v. N.Y. Dep't of Educ.*, No. 19cv533 (JGK), 2020 U.S. Dist. LEXIS 23772, at *24 (S.D.N.Y. Feb. 11, 2020) (dismissing IIED claim as "duplicative" where "allegations giving rise to the [IIED] claim . . . consist of the same allegations that give rise to the claims for defamation") (citing *Brancaleone v. Mesagna*, 736

---

[16] Moreover, Facebook had by that point *repeatedly* deleted Yemini's account for reasons unrelated to Defendants.  *See, e.g.*, Avi Yemini (@OzraeliAvi), Mar. 4, 2019, https://twitter.com/OzraeliAvi/status/1102674584615055361; Avi Yemini (@OzraeliAvi), Dec. 5, 2018, https://twitter.com/OzraeliAvi/status/1070218956332425217; Avi Yemini (@OzraeliAvi), Sept. 14, 2018, https://twitter.com/OzraeliAvi/status/1040746742998659072; Avi Yemini (@OzraeliAvi), Aug. 2, 2018, https://twitter.com/OzraeliAvi/status/1024923951368216577.

N.Y.S.2d 685, 687 (2d Dep't 2002), and *Ghaly v. Mardiros*, 611 N.Y.S.2d 582, 583 (2d Dep't 1994)).

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court dismiss Yemini's claims with prejudice.

Dated:   June 2, 2020                             Respectfully submitted,
         New York, NY

                                                  BALLARD SPAHR LLP

                                                  */s/ Jay Ward Brown*
                                                  Jay Ward Brown
                                                  Leita Walker (*pro hac vice pending*)
                                                  Maxwell S. Mishkin (*pro hac vice pending*)
                                                  1675 Broadway, 19th Floor
                                                  New York, NY 10019-5820
                                                  Telephone:  (212) 223-0200
                                                  Facsimile:  (212) 223-1942
                                                  brownjay@balladspahr.com
                                                  walkerl@ballardspahr.com
                                                  mishkinm@ballardspahr.com

                                                  *Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE WITH
## <u>WORD COUNT AND FORMATTING REQUIREMENTS</u>

1.      This brief complies with the word limit of Rule II.D of Judge Koeltl's Individual

Practices, because, excluding the portions exempted by that Rule, it contains 6,995 words.

2.      This document complies with the formatting requirements of Rule II.D of Judge

Koeltl's Individual Practices.

Dated:   June 2, 2020                        <u>*/s/ Jay Ward Brown*</u>
                                             Jay Ward Brown